# United States Court of Appeals
## For the First Circuit

No. 09-2174

UNITED STATES OF AMERICA,

Appellee,

v.

YEIFRIN RAFAEL OZUNA-CABRERA,
a/k/a Jeffrey Ozuna,
a/k/a Howard Edward Bond,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Lisa Aidlin for appellant.
Randall E. Kromm, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

November 2, 2011

**HOWARD**, **Circuit Judge**.  Yeifrin Rafael Ozuna-Cabrera appeals his conviction for aggravated identity theft, 18 U.S.C. § 1028A, and the reasonableness of his 70-month prison sentence. After careful review, we affirm.

## I. Background

The pertinent facts are uncomplicated.  On March 19, 2008, Ozuna-Cabrera applied for a U.S. passport under the alias "Howard E. Bond."  In support of the application, he presented an expired U.S. passport that bore Howard Bond's name, but Ozuna-Cabrera's picture.  The inconsistency was promptly discovered, and upon his arrest, Ozuna-Cabrera admitted to purchasing the once-valid passport, as well as a social security card, from the real Howard Bond.

Facing multiple charges, Ozuna-Cabrera pled guilty in March 2009 to two counts of false statements in a passport application, 18 U.S.C. § 1542, one count of unlawful re-entry of a deported alien, 8 U.S.C. § 1326, and one count of aggravated identity theft, 18 U.S.C. § 1028A.  The district court imposed a mandatory 24-month term of incarceration on the count of aggravated identity theft, consecutive to a 46-month prison term on the remaining counts, for an aggregate sentence of 70 months.

## II. Analysis

Ozuna-Cabrera appeals both his conviction and sentence. First, he contends that his guilty plea to aggravated identity

theft must be vacated because it violated Rule 11(b)'s requirements that it be knowing, voluntary, and amply supported by facts. See Fed. R. Crim. P. 11(b)(1)(G), (b)(2) and (b)(3). Specifically, he argues that because he purchased, rather than stole, Howard Bond's passport, he had lawful authority to use the misrepresented identity and was therefore not guilty of a § 1028A violation. Second, he challenges the district court's sentence calculation, asserting that it was unreasonably enhanced based on a nearly twenty-year-old conviction. We review each of these claims in turn.

**A. Rule 11 Claims**

Ozuna-Cabrera's Rule 11 arguments turn almost entirely on his construction of § 1028A. The aggravated identity theft statute provides, in relevant part:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, <u>without lawful authority</u>, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (emphasis added). Ozuna-Cabrera concedes every element of the offense but one: that his use of Howard Bond's identification was "without lawful authority."[1] He argues that,

---

[1]It is undisputed that Ozuna-Cabrera used Bond's identity to apply for a U.S. passport in violation of 18 U.S.C. § 1542, which is one of the specifically enumerated felonies in subsection (c) of 18 U.S.C. § 1028A. See § 1028A(c)(7) (any provision relating to

because Bond willingly sold him the means of identification, its subsequent use in support of Ozuna-Cabrera's passport application was lawfully authorized. This claim presents an issue of first impression for us: whether, in the context of 18 U.S.C. § 1028A(a)(1), the phrase "without lawful authority" must be construed to require that the means of identification be stolen, or otherwise taken without permission of the owner. We reject such a narrow reading.

As a preliminary matter, because Ozuna-Cabrera failed to raise this claim below, we review it only for plain error.[2] Accordingly, Ozuna-Cabrera bears the heavy burden of showing that his interpretation of the phrase "without lawful authority" to require theft of the means of identification is "compelled by the language of the statute itself, construction of the statute in light of the common law, or <u>binding</u> judicial construction of the statute." <u>United States</u> v. <u>Caraballo-Rodriguez</u>, 480 F.3d 62, 70 (1st Cir. 2007). We begin by looking at the language of § 1028A.

_____

passports and visas). It is also undisputed that Ozuna-Cabrera knew the passport once belonged to another person named Howard Bond. <u>See</u> <u>United States</u> v. <u>Godin</u>, 534 F.3d 51, 53-54 (1st Cir. 2008)(requiring the government to prove that the defendant knew that the means of identification belonged to another person).

[2]Ozuna-Cabrera's argument that his Rule 11 challenge was preserved by defense counsel at the sentencing hearing is plainly incorrect. At sentencing, his counsel explicitly conceded that Ozuna-Cabrera's conduct violated § 1028A(a)(1), noting only that it was an atypical case of aggravated identity theft.

Ozuna-Cabrera's reliance on the statutory text itself is unavailing. The phrase "without lawful authority," he argues, definitionally equates to "without authorized permission." We disagree. Though "authorized" activity may in many cases also be "lawful," the terms are not interchangeable. Rather, Black's Law Dictionary defines "lawful" as "not contrary to law," and "authority" as "[t]he right or permission to act legally on another's behalf." Black's Law Dictionary 152 & 965 (9th ed. 2009). Combining these definitions, § 1028A(a)(1) reasonably proscribes the transfer, possession, or use of another person's means of identification, absent the right or permission to act on that person's behalf in a way that is not contrary to the law. In other words, regardless of how the means of identification is actually obtained, if its subsequent use breaks the law - specifically, during and in relation to the commission of a crime enumerated in subsection (c) - it is violative of § 1028A(a)(1).

Ozuna-Cabrera's contextual argument also fails. As he points out, the aforementioned language of § 1028A(a)(1) is virtually identical to that of the general identity fraud statute, 18 U.S.C. § 1028, which provides:

> Whoever . . . knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person . . . .

18 U.S.C. § 1028(a)(7) (emphasis added). Thus, Ozuna-Cabrera asserts that unless we construe the phrase "without lawful

-5-

authority" to require theft under § 1028A(a)(1), the statute would cover the same conduct as § 1028(a)(7), and consequently be rendered superfluous. He further submits that this construction is supported by the statute's title, "Aggravated identity theft," and its enhanced penalty provision, which he suggests is intended to punish the theft of an identity more harshly than merely putting it to fraudulent use.

This argument ignores the broader statutory framework. As a general rule of statutory construction, "identical words used in different parts of the same Act are intended to have the same meaning." United States v. Upton, 559 F.3d 3, 11 (1st Cir. 2009) (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995)) (internal quotation mark omitted). This rule is strengthened where, as here, the relevant statutory provisions are in close proximity to each other. Comm'r v. Lundy, 516 U.S. 235, 250 (1996). If Congress had intended for the phrase "without lawful authority" to have substantially different meanings in § 1028A(a)(1) and § 1028(a)(7), "it would have manifested its intention in some concrete fashion." Upton, 559 F.3d at 11 (quoting Finnegan v. Leu, 456 U.S. 431, 438 n.9 (1982)) (internal quotation mark omitted). There is no reason to diverge from this canon of construction here. Instead, to discern the interplay between these two statutes, we need only refer back to the statutory language.

The identity fraud statute, § 1028(a)(7), covers the commission, or aiding and abetting in the commission, of "any unlawful activity that constitutes a violation of Federal law, or . . . a felony under any applicable State or local law." By contrast, the aggravated identity theft statute, § 1028A(a)(1), covers "any felony violation enumerated in subsection (c)" - a discrete list of federal felonies. The statutes are therefore distinguishable not by the method of procuring the means of identification, but by the underlying criminal conduct that they respectively target. Section 1028A(a)(1) is a logical extension of § 1028(a)(7), and punishes more severely those identity crimes committed during and in relation to a specifically enumerated subset of problematic felonies.[3] See, e.g., United States v. Godin, 534 F.3d 51, 62 (1st Cir. 2008) (Lynch, C.J., concurring) ("[In enacting § 1028A,] Congress was responding to the drastic upsurge in what are called identity theft crimes and which

---

[3]Ozuna-Cabrera makes much of the statute's title, arguing that inclusion of the term "theft" suggests that the identity must be stolen. As we have previously held, we do not "rely on the titles of statutory enactments in plumbing their meaning . . . at the expense of the text itself." Mass. Ass'n of Health Maint. Orgs. v. Ruthardt, 194 F.3d 176, 180 (1st Cir. 1999) (internal citation omitted). Even if we did consider the title, it supports the present interpretation of the statutory language. The term "aggravated" in "aggravated identity theft" underscores the use of § 1028A as an extension of § 1028 to punish particular crimes warranting harsher sentences. See Godin, 534 F.3d at 59 ("It is not clear that, by using the word 'theft' [in the title of § 1028A], Congress intended to limit 'identity theft' to . . . scenario[s] involving traditional theft").

encompass a variety of situations."); <u>United States</u> v. <u>Jimenez</u>, 507 F.3d 13, 22 (1st Cir. 2007) ("[T]he purpose of [§ 1028A] is to create an additional penalty for using false identities that are particularly difficult to expose or that are used in conjunction with terrorism offenses.").

Legislative history supports this interpretation. Ozuna-Cabrera accurately notes that Congress added § 1028A to the United States Code through the "Identity Theft Penalty Enhancement Act," Pub. L. No. 108-275, 118 Stat. 831 (2004). He is also correct that the House Report is replete with references to "theft" and "thieves," and that one stated purpose of the statute is to increase sentences for "identity thieves." H.R. Rep. No. 108-528, at 3, <u>as reprinted</u> in 2004 U.S.C.C.A.N. 779, 780. The report provides several examples of conduct that fit within the traditional definition of theft, like stealing credit-card and social security numbers, and stealing identities to file false tax returns or apply for social security benefits. <u>Id.</u> at 5-6, 2004 U.S.C.C.A.N. at 781-82.

Without question, Congress harbored concerns over criminals who actually steal other people's identities. There is nothing to suggest, however, that Congress intended to so narrowly restrict the statute's reach to identity crimes involving such traditional notions of theft. On the contrary, the same House Report stated that "[t]he terms 'identity theft' and 'identity

-8-

fraud' refer to all types of crimes in which someone wrongfully obtains and uses another person's personal data . . . ." H.R. Rep. No. 108-528, at 4, 2004 U.S.C.C.A.N. at 780. Indeed, the report describes several anecdotal examples of identity theft that do not involve stealing the means of identification. In one instance, a man used his brother-in-law's name and social security number to obtain social security benefits, and in a similar case, a woman used her husband's social security number to collect disability benefits. Id. at 6, 2004 U.S.C.C.A.N. at 782. This legislative record demonstrates that Congress intended § 1028A to address a wide array of identity crimes, and not only those iterations involving conventional theft.

Finally, although this issue is new to this court, we do not write on a blank slate. Five other courts of appeals have concluded that theft of the means of identification is not required to trigger criminal liability under § 1028A(a)(1). See, e.g., United States v. Retana, 641 F.3d 272, 273-75 (8th Cir. 2011) (father's permission to use his social security number does not amount to "lawful authority" to excuse defendant's fraudulent use of the information to commit other crimes); United States v. Mobley, 618 F.3d 539, 547-48 (6th Cir. 2010) (finding a § 1028A violation for credit card conspiracy where victims willingly provided their social security numbers); United States v. Abdelshafi, 592 F.3d 602, 607-09 (4th Cir. 2010) (affirming a

§ 1028A conviction for the fraudulent use of lawfully acquired Medicaid information); United States v. Carrion-Brito, 362 F. App'x 267, 273 (3d Cir. 2010) (permission or payment to use another's identity does not bestow "lawful authority" on the perpetrator); United States v. Hurtado, 508 F.3d 603, 607-08 (11th Cir. 2007), abrogated in part on other grounds, Flores-Figueroa v. United States, 556 U.S. 646 (2009) (same); see also Godin, 534 F.3d at 59 (stating, in dicta, that "it is . . . plausible that Congress intended to define 'identity theft' as using someone else's identity rather than taking someone else's identity").

Ozuna-Cabrera fails to identify any contrary, binding judicial precedent that compels his interpretation of the statute. His reliance on Flores-Figueroa and United States v. Villanueva-Sotelo, 515 F.3d 1234 (D.C. Cir. 2008), is misplaced. Those courts were addressing a substantially different question - whether § 1028A requires proof of a defendant's knowledge that he was using a real person's identity. Neither court squarely considered, much less determined, whether the statute would be violated if the means of identification was not actually stolen. At best, Flores-Figueroa and Villanueva-Sotelo may support the presently unhelpful proposition that theft is a sufficient, but not necessarily required, element of § 1028A. Thus, in light of the existing precedent, which overwhelmingly supports our textual and contextual analysis, we conclude that § 1028A(a)(1) does not require theft, or

any other illicit method of procurement, of the means of identification.[4]

Although Ozuna-Cabrera attempts to parse this issue from his Rule 11 arguments, the alleged Rule 11 violations depend almost entirely on the assumption that his construction of § 1028A is correct.[5]  Absent this foundation, his remaining Rule 11 arguments necessarily crumble.

Ozuna-Cabrera first challenges the factual basis for the charges, see Fed. R. Crim. P. 11(b)(3), arguing that the district court erred in accepting the prosecution's explanation of the aggravated identity theft charge without conducting an independent review.  It is not error to accept the government's recitation of the facts as the basis for a plea.  See United States v. Matos-Quiñones, 456 F.3d 14, 21 (1st Cir. 2006) (accepting uncontradicted facts proffered by the government as a rational basis for defendant's plea).  In any event, the court did not rest there, as it confirmed that Ozuna-Cabrera understood the facts, and

---

[4]Ozuna-Cabrera additionally points us to the rule of lenity and the interpretive canon that criminal statutes must be strictly construed.  The rule of lenity does not apply here, however, because § 1028A(a)(1)'s text is unambiguous.  See United States v. Nunez, 146 F.3d 36, 40 (1st Cir. 1998).

[5]Insofar as Ozuna-Cabrera's remaining Rule 11 arguments depend on his construction of § 1028A, we will not revisit the issue.  The court need not have delineated a theft requirement that does not exist in the statute, and Ozuna-Cabrera's argument that his construction of § 1028A precludes a sufficient factual basis for his plea inevitably fails.

-11-

summarized the evidence supporting the identity theft charge. Ozuna-Cabrera's 11(b)(3) challenge consequently fails. See United States v. Cheal, 389 F.3d 35, 41 (1st Cir. 2004) (holding that Rule 11(b)(3) is fulfilled if the court ensures that there is, on the record as it stands at the time of the plea, a reasoned basis to believe that the defendant actually committed the crime to which he is admitting guilt).

Ozuna-Cabrera further contends that his guilty plea was not knowing and voluntary because the district court never explained the elements of aggravated identity theft; in particular, that the district court failed to unpack the statute's scienter requirement. See Fed. R. Crim. P. 11(b)(1)(G). The record suggests otherwise. During the plea colloquy, the district court informed Ozuna-Cabrera that:

> Count Three of the indictment again charges essentially the same crime; however, here it alleges that on March 19, 2008, in making a false statement in an application for a passport you used somebody else's identification, knowing that you weren't authorized to use that identification.

(Emphasis added). Later in the hearing, at the court's request, the government also addressed the aggravated identity theft count as follows:

> Aggravated identity theft makes it unlawful . . . to, without lawful authority, use a means of identification during and in relation to a violation of a variety of federal offenses, including [making false statements in a passport application]. "Means of

-12-

> identification" is defined in [18 U.S.C.
> § 1028(d)(7)], and includes such items as:
> Name, Social Security number, date of birth,
> and state-issued driver's license. Here there
> is a real Howard Edward Bond, and the
> defendant used his name and all of his
> identifiers to try to obtain a passport on
> March 19, 2008.

The court then asked Ozuna-Cabrera if he understood the nature of the charges, and ensured that he was pleading willingly and had received sufficient time to discuss the charges with his attorney.

On a plain error standard of review, the question is not whether the plea colloquy satisfied Rule 11, but whether it was so deficient that it affected substantial rights and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. See United States v. Savinon-Acosta, 232 F.3d 265, 268 (1st Cir. 2000). Based on a thorough review of the record, the answer to this question must be no. See United States v. Cruz-Rivera, 357 F.3d 10, 13 (1st Cir. 2004) (holding that where the charges are not complex, a simple recitation of the indictment may be sufficient to satisfy Rule 11); see also United States v. Martinez-Martinez, 69 F.3d 1215, 1220 (1st Cir. 1995) ("The description of the charges need not come directly from the court so long as the record reveals that the defendant understood them."). Finding no plain error in the district court's construction of § 1028A or its acceptance of Ozuna-Cabrera's guilty plea, we affirm his conviction.

**B. Sentencing Challenges**

Ozuna-Cabrera also appeals his sentence. The presentence investigation report (PSI Report) recorded his base offense level at 8, applied a sixteen-level enhancement for a prior drug trafficking charge, U.S.S.G. § 2L1.2(b)(1)(A)(i),[6] and recommended a three-level reduction for acceptance of responsibility, id. § 3E1.1. Ozuna-Cabrera's prior convictions, and the fact that he had committed the instant offense while under a criminal sentence, placed him in criminal history category (CHC) V. Assuming an adjusted offense level of 21 and a CHC of V, the guideline sentencing range (GSR) would have included a mandatory 24 months for the count of aggravated identity theft, and spanned 70-87 months on the remaining three counts, for an effective advisory guideline range of 94-111 months.

While Ozuna-Cabrera did not object to the PSI Report, he did file a sentencing memorandum asserting that his CHC overrepresented the gravity of his prior offenses, which, he alleged, stemmed largely from his personal use of drugs and alcohol. He also urged a variant sentence, arguing that the nature

---

[6]Section 2L1.2(b)(1)(A)(i) of the Sentencing Guidelines advises that "[i]f the defendant previously was deported . . . after a conviction for a felony that is a drug trafficking offense for which the sentence imposed exceeded 13 months . . . increase [the base offense level] by 16 levels." U.S.S.G. § 2L1.2(b)(1)(A)(i). In 1991, Ozuna-Cabrera was convicted of a drug-trafficking offense for which he was sentenced to six months for the original violation, and a further nine months for violating probation. He was deported shortly thereafter.

and timing of his 1991 drug trafficking conviction did not warrant a sixteen-level enhancement, and that the absence of an early disposition program created an unacceptable disparity.[7]

The district court agreed that Ozuna-Cabrera's CHC overrepresented the seriousness of his past crimes and departed downward to a CHC of IV. In light of the absence of an early disposition program, the court also reduced the offense level from 21 to 19, shrinking the GSR to the mandatory 24 months for aggravated identity theft, and 46-57 months for the remaining three counts. The court refused, however, to grant a sentence below the reconfigured sentencing range, imposing a total incarcerative term of 70 months.

On appeal, Ozuna-Cabrera mounts both procedural and substantive challenges to his sentence. Procedurally, he contends that the district court, in following the guidelines and applying the sixteen-level enhancement, failed to consider the sentencing factors outlined in 18 U.S.C. § 3553(a). Substantively, he argues

---

[7]Early disposition or "fast-track" programs permit prosecutors to provide the prospect of shorter sentences in return for prompt guilty pleas and, in some cases, waiver of appellate rights. In 2003, Congress authorized the Attorney General to create fast-track programs on a district-by-district basis, and directed the Sentencing Commission to promulgate a policy statement allowing downward departures in eligible cases. See Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act, Pub. L. No. 108-21, § 401(m)(2)(B), 117 Stat. 650, 675 (2003). Massachusetts was not one of the districts chosen for a fast-track program. Ozuna-Cabrera argued that the absence of a fast-track program in the District of Massachusetts resulted in an unwarranted sentencing disparity.

that the application of § 2L1.2(b)(1)(A)(i) renders his sentence unreasonable. Given a properly calculated GSR, we review a sentence for abuse of discretion. Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008).

Ozuna-Cabrera's sentence is both procedurally and substantively sound. As to the procedural challenge, although the district court only summarily acknowledged its consideration of § 3553(a), it need not have engaged in an exhaustive analysis of each factor. United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006) ("[The district court] is not required to address [each § 3553(a)] factor[], one by one, in some . . . rote incantation when explicating its sentencing decision."). Nor must the court provide a voluminous explanation of its reasoning. Where a sentence is within the applicable guidelines, it "require[s] a lesser degree of explanation than those that fall outside the guideline sentencing range," and we think that particularly true where, as here, "the sentence is at the very bottom of the Guidelines range." United States v. Arango, 508 F.3d 34, 48 (1st Cir. 2007) (quoting United States v. Turbides-Leonardo, 468 F.3d 34, 41 (1st Cir. 2006)) (internal quotation marks omitted).

The district court considered both the PSI Report and the sentencing memorandum, and ultimately reduced Ozuna-Cabrera's sentence to account for his criminal history and the unavailability

of an early disposition program.  Given Ozuna-Cabrera's pattern of recidivistic addiction, the court also referred him to a drug treatment program, and with respect to the application of the sixteen-level enhancement, the court stated:

> [O]n balance, I think I come out closer to [the government's] position than I do the defendant's.  There's just too many crimes, too many missed opportunities, too many aliases.

In stark contrast to the allegedly mechanistic application of the GSR, the court appears to have specifically tailored its sentence to Ozuna-Cabrera's individual circumstances, based at least in part on § 3553(a).  See 18 U.S.C. § 3553(a)(1) (accounting for the defendant's personal history and characteristics), (a)(2)(D) (providing needed medical care), & (a)(6) (adjusting to avoid "unwarranted sentencing disparities").  The fact that the district court chose not to sentence Ozuna-Cabrera according to his counsel's recommendation does not establish that it failed to consider the relevant factors.  United States v. Butler-Acevedo, --- F.3d ---, 2011 WL 3831681, at *2 (1st Cir. 2011).

Turning to the substantive challenge, when evaluating the substantive reasonableness of a sentence, we consider the totality of the circumstances and give due deference to the district court.  See Gall, 552 U.S. at 51; United States v. Wallace, 573 F.3d 82, 97 (1st Cir. 2009).  A defendant who attempts to brand a within-range sentence as unreasonable must carry a heavy burden, United States

-17-

v. Pelletier, 469 F.3d 194, 204 (1st Cir. 2006), and a sentence will withstand a substantive reasonableness challenge so long as there is "a plausible sentencing rationale and a defensible result," Martin, 520 F.3d at 96.

To the extent that Ozuna-Cabrera challenges the substantive reasonableness of his sentence - specifically, the purported draconian nature of U.S.S.G. § 2L1.2[8] - the sentence was not only amply supported by the record, but was also the lowest within the GSR. In determining whether to apply the sixteen-level enhancement, the court concluded that the underlying 1991 conviction was not merely an aberration, but one of a lengthy list of convictions in Ozuna-Cabrera's rather extensive criminal history.[9] This conclusion, and the resulting sentence, were both plausible and defensible, and Ozuna-Cabrera presents no powerful mitigating reasons to suggest that the district court was unreasonable. See United States v. Beatty, 538 F.3d 8, 17 (1st Cir. 2008) (requiring "powerful mitigating reasons" for any "defendant who wishes to attack an in-guideline-range sentence as

---

[8]Ozuna-Cabrera also argues that a § 2L1.2 enhancement is not available under Almandarez-Torres v. United States, 523 U.S. 224 (1998). We have repeatedly rejected this argument, and do so again here. See, e.g., United States v. Charlton, 600 F.3d 43, 55 (1st Cir. 2010).

[9]When the PSI Report was compiled, Ozuna-Cabrera had fifteen convictions, with an additional ten charges pending. The government stated, and Ozuna-Cabrera did not refute, that he had used fourteen different aliases with fifteen different birth dates and twelve different social security numbers.

-18-

excessive") (quoting <u>United States</u> v. <u>Navedo-Concepción</u>, 450 F.3d 54, 59 (1st Cir. 2006) (internal quotation marks omitted).  Without more, we see no basis for disturbing his sentence.

### III. Conclusion

For the foregoing reasons, Ozuna-Cabrera's conviction and sentence are **affirmed.**