THOMPSON, Circuit Judge,
dissenting.
Because my colleagues impose an unwarranted restriction on the intentionally broad language of the Sarbanes-Oxley Act, employ a method of statutory construction diametrically opposed to the analysis this same panel employed just weeks ago, take pains to avoid paying any heed to considered agency views to which circuit precedent compels deference, and as a result bar a significant class of potential securities-fraud whistleblowers from any legal protection, I dissent.
Accepting the allegations in the complaint as true, plaintiffs Lawson and Zang are ex-employees of private companies that contract to advise or manage the publicly held Fidelity-brand mutual funds. The mutual funds themselves have no employees. Both plaintiffs blew the whistle on putative fraud by the mutual funds, and both were fired (actually or constructively) by their employers.
The Sarbanes-Oxley Act purports to protect securities-fraud whistleblowers. Specifically, § 806 of the Act provides that “[n]o company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 781), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee” to report activity the employee reasonably suspects to be securities fraud. 18 U.S.C. § 1514A(a) (prior to amendment by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010).
For present purposes, it is undisputed that the Fidelity mutual funds fall under § 806, that the plaintiffs’ employers contracted with the Fidelity mutual funds, and *84 that the plaintiffs’ employers discharged the plaintiffs — their employees. In other words, in each case a “contractor ... of such company ... discharged] ... an employee.” Id. One might think our inquiry would end here: Sarbanes-Oxley’s whistle-blower-protection provision by its terms applies. According to the majority, however, one would be incorrect.
The majority engage in a faulty statutory-interpretation exercise, one whose wrongness is perhaps best highlighted through contrast with our recent decision in United States v. Ozuna-Cabrera, 663 F.3d 496 (1st Cir.2011). In Ozunctr-Cabrera, we held that application of the “Aggravated Identity Theft” statute is not restricted to situations involving traditional theft. Id. at 501. This is how our analysis went:
First, we looked to the plain language of the statute and noted that it contained no restriction limiting the statute’s application to situations involving theft. Id. at 498-99. Instead, the statute contained only the broad phrase “without lawful authority.” Id. Second, we looked to the statutory framework, noting that the phrase “without lawful authority” was used in the statutes criminalizing both identity fraud and aggravated identity theft. Id. at 499. Because identical language appeared in both, related statutes, only one of which referenced theft at all (albeit in the title), we deemed it unlikely that Congress intended the phrase to import the elements of common-law theft. Id. Third, in a footnote, we looked to the statutory title (which, again, referenced theft) and noted that “we do not rely on the titles of statutory enactments in plumbing their meaning ... at the expense of the text itself.” Id. at 499 n. 3 (internal quotation marks removed). We also noted that it was by no means clear that the word “theft” in the title was intended to limit the effective language of the statute. Id. (citing United States v. Godin, 534 F.3d 51, 59 (1st Cir.2008)). Fourth and finally, we looked at legislative history and noted that implicitly restrictive references to “theft” could not limit the scope of broad statutory language. Id. at 500. More specifically, nothing in the legislative history explicitly suggested “that Congress intended to so narrowly restrict the statute’s reach.” Id. Instead, the legislative history “demonstratefd] that Congress intended [the statute] to address a wide array of’ conduct. Id. Applying this same analysis to the present case produces a very different result than the one the majority reach.
First, looking to the plain language of the statute, one can only conclude that there is no restriction limiting the statute’s application to employees of publicly held companies.[26] As I have already pointed out, boiling the statute down to its relevant syntactic elements, it provides that “no ... contractor ... may discharge ... an employee.” 18 U.S.C. § 1514A(a). The statute does not limit its coverage to “an employee of a publicly held company” it just refers broadly to “an employee.”
In fact, the majority’s interpretation offends a longstanding rule of statutory interpretation, violating the statutory language by rendering the word “contractor” in the statute superfluous. See, e.g., United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir.1985) (providing that “no *85 construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous”). The majority suggest that the word “contractor” might be intended only to refer to so-called “ax-wielding specialists” that public companies bring in to lay off employees. Maj. Op. 69 n. 11; see also Fleszar v. U.S. Dept. of Labor, 598 F.3d 912, 915 (7th Cir.2010) (employing the term “ax-wielding specialist” and providing the example of “the character George Clooney played in ‘Up in the Air’ ”). If that is indeed the case, it is a mystery why Congress did not say so specifically. But more importantly for present purposes, when ax-wielding specialists actually fire public-company employees they are acting as agents (rather than mere contractors) of the public company. And § 806 specifically lists agents as covered entities, just like contractors. The word “contractor,” therefore, must be doing something else. In the end, then, not only do the majority impose extratextual limitations on § 806, but they also effectively evict the word “contractor” from the statute.[27] This is simply wrong. See Ven-Fuel, 758 F.2d at 751-52.
Second, looking to the statutory framework, one sees that Congress explicitly enacted narrower whistleblower protection elsewhere in Sarbanes-Oxley, that Congress was explicit where it intended to regulate public entities only, and that Congress’s choices about different mechanisms for different entities support the plaintiffs’ reading of the Act. Cf. Maj. Op. 70-71 (noting that Congress explicitly “enact[ed] broader whistleblower protection elsewhere ... was explicit ... where it intended to regulate non-public entities ... [and] made choices about different regulatory mechanisms for different entities”).
An example of Congress’s enactment of narrower whistleblower protection appears in Sarbanes-Oxley § 501, which bars “a broker or dealer and persons employed by a broker or dealer” from retaliating against “any securities analyst employed by that broker or dealer or its affiliates.” 15 U.S.C. § 78o-6(a)(1)(C). Congress could have similarly narrowed the definition of “employee” in § 806, but it chose not to do so. We should honor that choice.[28] Limone v. United States, 579 F.3d 79, 105 (1st Cir.2009); see also Pac. Operators, 132 S.Ct. at 686-88 (“Congress’ decision to specify, in scrupulous detail, exactly where the other subsections of § 1333 apply, but to include no similar restriction ... in § 1333(b), convinces us that Congress did not intend” to so limit § 1333(b).).
An example of Congress’s specific reference to publicly held companies appears in § 806 itself. Section 806 specifically invokes companies “with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 781)” or “required to file reports under *86 section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).” The section goes on to list a number of other covered entities, including contractors. It also uses the modifier “of such companies” at one point to refer to, e.g., contractors, but notably not to refer to employees. In fact, the section does not limit the word “employees” in any way. Again, we should honor Congress’s choice to employ broad language. Limone, 579 F.3d at 105.
And the majority’s own examples of Congress’s electing to apply different mechanisms to different entities highlight the correctness of a broad reading of § 806. The majority note that “[elsewhere in SOX, Congress did specifically address investment companies and investment advisers.” Maj. Op. 73. The first example they look to is a provision that exempts investment entities (including mutual funds and mutual fund advisers) from certain, specific requirements of the Act. See 15 U.S.C. § 7263. No such exemption appears in § 806, and the absence of an exemption surely suggests that Congress intended to protect the employees of mutual fund advisers.[29] The majority’s second example — 15 U.S.C. § 80b-3 — deals with the “Registration of investment advisers” and says nothing of whistleblowers. Maj. Op. 73. The existence of a section tailored to investment advisers hardly exempts such entities from Sarbanes-Oxley’s broader provisions' — like § 806. After all, Congress knew how to exempt’investment entities when it wanted to do so. See 15 U.S.C. § 7263.
Third, the statute’s title and caption do not compel a limited reading of its language; instead, the majority’s strained reading comes “at the expense of the text itself.” Ozuna-Cabrera, 663 F.3d at 499 n. 3. I have already explained how nothing in either the text or the context of § 806 actually supports the limitation conjured by the majority. A few words in a title are not sufficient to change that rock-solid fact. That insufficiency is especially glaring where, as here, the title does not purport to apply any explicit limitations (e.g., “whistleblower protection for employees of public companies only”) but merely describes a specific and common application of a more generally applicable statute.[30] Cf. Ozuna-Cabrera, 663 F.3d at 500 (“aggravated identity theft” may commonly apply to “criminals who actually steal other people’s identities,” but this is only one application of a broad statute). Under Ozuna-Cabrera and other circuit precedent, see, e.g., Mass. Ass’n of Health Maint. Orgs. v. Ruthardt, 194 F.3d 176, 180 (1st Cir.1999), the title gets the majority nowhere.
Fourth, nothing in the legislative history of Sarbanes-Oxley indicates congressional intent to limit whistleblower protection to employees of public companies. Instead, the legislative history all refers positively to extending whistleblower protection in order to encourage the reporting of securities fraud.
According to Sarbanes-Oxley’s Senate conference report (Section I, titled “PURPOSE”) a key purpose of the chapter that includes § 806 is “to protect whistleblowers who report fraud against retaliation by their employers.” S.Rep. No. 107-146, at *1 (2002). There is no mention of any limitation on which employers are covered. The breadth of this specific purpose comports with the Act’s overall purpose: “to *87 prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions.” Id. Indeed, this very court has endorsed a broad understanding of the Act’s purpose, noting that “[t]he § 1514A whistleblower provision thus serves to ‘encourage and protect [employees] who report fraudulent activity that can damage innocent investors in publicly traded companies’ ” and that “[i]t also aimed ‘to provide federal protection to private corporate whistle-blowers.’” Day v. Staples, Inc., 555 F.3d 42, 52 (1st Cir.2009) (alteration in original) (quoting S.Rep. No. 107-146, at *17 (2002), and Carnero v. Bos. Scientific Corp., 433 F.3d 1, 11 (1st Cir.2006)). Again, extending whistleblower protection to employees of contractors fits both with the specific whistleblower-protection purpose of Sarbanes-Oxley and with its broader anti-fraud purpose.
Moreover, none of the legislative history the majority rely on actually evidences any congressional intent to limit the scope of § 806’s whistleblower protection. All of the statements the majority highlight denote intent to protect employees of publicly traded companies. See Maj. Op. 77-78. Such protection is a wholly uncontroversial and undisputed effect of § 806.[31] The question is whether protection is limited to employees of public entities only. And none of the majority’s sources — indeed, no source at all — expresses any intent to restrict § 806 so narrowly.[32] Cf. Ozuna-Cabrera, 663 F.3d at 500 (“Without question, Congress harbored concerns over criminals who actually steal other people’s identities. There is nothing to suggest, however, that Congress intended to so narrowly restrict the statute’s reach.”). It is strange that the same circumstance — lack of congressional intent to limit broad statutory language — could cut so differently in two different cases.
And the majority’s reliance on subsequent legislative history is entirely misplaced. Not only does their reading of the whistleblower provision’s subsequent amendment defy their own faulty logic, but they also ignore the administrative backdrop against which Sarbanes-Oxley was amended by Dodd-Frank.
On the first point, the majority’s read of Dodd-Frank defeats their overall conclusion as a matter of simple grammar. On the one hand, they say that the phrase (from 18 U.S.C. § 1514A) “No [public company], or any ... contractor ... of such company, may discharge ... an employee” does not extend protection to employees of contractors. On the other hand, they say that the phrase (from the same section, post-Dodd-Frank) “No [public company] ... or nationally recognized statistical rat *88 ing organization ... may discharge ... an employee” does apply to employees of ratings companies. Maj. Op. 79-80 (noting that Dodd-Frank “explicitly extend[ed] whistleblower coverage to ... employees of statistical rating organizations”). In these phrases, “contractor” and “rating organization” are syntactic equivalents and should therefore be given equal effect. The statute plainly protects both employees of contractors and employees of rating companies.
As to the majority’s ignoring the administrative backdrop, let us start with the well-settled proposition that the courts, when construing a statute, assume that at the time of the statute’s enactment, Congress was aware of courts’ and agencies’ interpretations of existing law. Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (“Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.”). At the time of Dodd-Frank, the Department of Labor (which is statutorily tasked with administratively adjudicating § 806 whistleblower claims, see 18 U.S.C. § 1514A(b)(l)) had issued notice-and-comment regulations explicitly providing that § 806 applied to employees of contractors of public companies. 29 C.F.R. § 1980.101 (2009) (defining “employee” as “an individual presently or formerly working for a company or company representative” and “company representative” as, e.g., “any ... contractor ... of a company”). In enacting Dodd-Frank in 2010, then, Congress had a miles-wide opening to nip Labor’s regulation in the bud if it had wished to do so. It did not. To the (very limited) extent subsequent legislative history tells us anything here, it tells us that the majority are incorrect.
So if circuit precedent has any kind of methodological value then the majority go about things exactly backwards in this case. To reiterate: contrary to this panel’s analysis in Ozuna-Cabrera, the majority ignore the text of § 806, take a myopic view of the section’s context, wrongly inflate the section’s title into operative law, and attribute a limiting intent to legislative history that in reality supports a broad reading of the statute. Again, the majority are wrong.[33]
To the extent the majority rely on analogous statutes, they get that wrong, too. There is indeed evidence that Sarbanes-Oxley was based in part on the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (“AIR”). See S. Rep. 107-146, at *26 (2002). The relevant provision of AIR is entitled “Discrimination against airline employees,” and reads, “[n]o air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee.” 49 U.S.C. § 42121(a). This structure perfectly parallels § 806’s: “[n]o company ... or any ... contractor [or] subcontractor ... of such company, may discharge ... or in *89 any other manner discriminate against an employee.” Just as in § 806, AIR does not specify whether it protects employees of carriers only or whether it protects employees of contractors and subcontractors as well. The majority conclude that AIR protects employees of carriers, contractors, and subcontractors, but that § 806 protects only employees of public companies, primarily because — in the majority’s view, notwithstanding the broad language passed by the legislative branch and the considered interpretation of the executive branch § 806 would be excessively broad.[34] Maj. Op. 73-74. This is judicial overreaching of the highest order.[35]
Other basic principles of statutory interpretation support a broad reading of § 806 and undermine the majority’s reasoning. These principles are: (1) that we broadly interpret remedial statutes; (2) that we narrowly interpret criminal and immigration statutes; and (3) that we presume a statute will not create a right of action by implication. The relevance of these principles here is not immediately apparent, so I will explain.
First, courts generally adhere to the principle that “[r]emedial statutes are liberally construed to suppress the evil and advance the remedy.” 3 Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 60:1 (7th ed.2010); accord Dudley v. Hannaford Bros. Co., 333 F.3d 299, 307 (1st Cir.2003) (citing Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)). It should be achingly clear at this point that § 806 is remedial in nature; specifically, it aims to remedy the evil of companies’ firing employees for reporting putative securities fraud. Where the statutory language supports a broad reading that comports with that remedial purpose, precedent calls for courts to implement that broad reading. See Dudley, 333 F.3d at 307. The majority inexplicably fail to heed this call.
Second, at the opposite end of the interpretative spectrum is the so-called rule of lenity, an “ancient rule of statutory construction that penal statutes should be strictly construed against the government ... and in favor of the persons on whom penalties are sought to be imposed.” 3 Singer, Sutherland Statutory Construction § 59:3. In Ozuna-Cabrera, a criminal case, we held that this principle had no place because the text did not support the defendant’s proposed limitations. See 663 F.3d at 498-99. Now, in a context where we are supposed to default to breadth and reject narrowness, the majority nevertheless impose analogous extratextual limitations. This is precisely backwards.
*90 In fact, in rejecting a broad reading of § 806 and imposing a narrow one, the majority rely in significant part on cases where (unlike here) narrow interpretations were absolutely appropriate under the rule of lenity. For example, in I.N.S. v. Nat’l Ctr. for Immigrants’ Rights, Inc. (NCIR), 502 U.S. 183, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991), the Supreme Court narrowed the scope of the word “employment” as used in a statute imposing restrictive bond conditions on aliens embroiled in removal proceedings.[36] In other words, by narrowing the types of employment that immigrants could not undertake while out on bond, the Court benefitted them and thereby honored the rule of lenity. NCIR does not by any means suggest that a restrictive interpretation is appropriate to strip intentionally broad legal protections from whistleblowers.[37]
Third and last is the presumption against implied rights of action. The majority repeatedly cite cases expressly applying this principle as if these cases somehow support limiting explicit causes of action, too. Here is a list of several such cases on which the majority wrongly rely: Janus Capital Grp., Inc. v. First Derivative Traders, — U.S. -, 131 S.Ct. 2296, 2303, 180 L.Ed.2d 166 (2011) (holding that a mutual fund adviser may not be found liable for a mutual fund’s violation of SEC Rule 10b-5, in part because of “the narrow scope that [courts] must give the implied private right of action”); Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 128 S.Ct. 761, 772, 169 L.Ed.2d 627 (2008) (noting that courts should limit the scope of implied rights of action because judicial creation of such remedies “runs contrary to the established principle that ‘[t]he jurisdiction of the federal courts is guarded against expansion by judicial interpretation’ ” (quoting Cannon v. Univ. of Chi, 441 U.S. 677, 746-47, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting))); Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (holding that the implied right of action under SEC Rule 10b-5 does not extend to aiders and abetters because “Congress knew how to impose aiding and abetting liability when it chose to do so”); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 734, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (limiting the availability of the implied right of action under Rule 10b-5 to actual purchasers and sellers of securities, in part because “[w]hen Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble doing so expressly”). Here, we are not faced with an implied right of action that should be applied narrowly; instead, we are dealing with a statute that expressly creates a broad right of action for employee-whistleblowers who suffer retaliation at their employers’ hands. By rejecting Congress’s intentional breadth, the majority undermine the legislative process in precisely the same way that the Supreme Court has warned against time *91 and time again in the context of implied rights of action. That they do so by restricting a broad statute rather than expanding a narrow statute is beside the point: they are still usurping Congress’s lawmaking role in our system of government.
Even more egregious, though, is the majority’s conclusion — after thirty-five pages construing a statutory provision to which they say “different readings may be given,” Maj. Op. 67 that the statute is “not ambiguous” and even “clear” in imposing a limitation on the word “employee” that appears nowhere in the statute’s text. Id. at 80, 83. This peculiar determination[38] appears to be nothing more than a mechanism for rejecting the views of multiple federal agencies[39] that come into daily contact with the Sarbanes-Oxley Act and its whistleblower provision, and for downplaying this court’s earlier determination that agency views are entitled to deference. In fact, the clearest thing about the statute is its breadth, as the Department of Labor’s regulations confirm.
As I’ve mentioned above, the Department of Labor has adjudicatory authority over Sarbanes-Oxley whistleblower complaints.[40] 18 U.S.C. § 1514A(b)(1). To exercise that authority, the Department of Labor has promulgated regulations regarding Sarbanes-Oxley. 29 C.F.R. § 1980.100 et seq. The regulations specifically provide that Sarbanes-Oxley^ whistleblower protection extends to employees of contractors of public companies. Id. § 1980.101. On this point, Labor found the statute as clear as I do: the regulations proclaim that they are non-interpretative, 69 Fed.Reg. 52104, 52105 (Aug. 24, 2004), so Labor must have thought the statute simply means what it says: “[n]o ... contractor ... of such company! ] may discharge ... an employee” for reporting fraud. 18 U.S.C. § 1514A(a). And we have previously held that the regulations are entitled to Chevron deference, Day, 555 F.3d at 54 & n. 7, meaning that we should honor Labor’s read of the statute unless it is arbitrary and capricious or contrary to law. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
Again, all this would seem to end our inquiry. Not only does Sarbanes-Oxley § 806 by its terms protect employees of contractors of public companies, but the agency that handles every § 806 whistle-blower complaint has issued formal regulations recognizing that straightforward interpretation, and this court has held that the regulations are owed deference. But, somehow, the authority of all three branches of government does not win the day: the majority disregard Congress’s broad language, reject the agency’s regulations out of hand, and do their best to neutralize this court’s decision in Day by labeling it both distinguishable and dicta. Maj. Op. 81 n. 22.
Here is what we said in Day: “Both the DOL regulations, which are entitled to *92 Chevron deference, and the caselaw establish that the term ‘reasonable belief has both a subjective and objective component. We agree.” Day, 555 F.3d at 54. We then went on to explain why the regulations were due Chevron deference, noting among other things that “Congress explicitly delegated to the Secretary of Labor authority to enforce § 1514A by formal adjudication.” Id. at 54 n. 7. This is not the stuff of dicta. We did not merely “accept ... that certain DOL regulations ... were entitled to Chevron deference,” Maj. Op. 81 n. 22 — we stated affirmatively that they were, explained our reasoning on the point, and relied on the conclusion in reaching our result. And our broad statement may not have been “concerned with the precise regulations at issue here,” id., but it did not purport to involve precise regulations; instead, it spoke sweepingly of Labor’s regulations regarding § 1514A. If Day remains good law then it controls here and we owe deference to Labor’s regulations.
That said, we need not go so far as to apply Chevron deference here. While the Department of Labor does suggest that Day compels some degree of deference, it concedes that the regulations are properly due something less than Chevron deference. Naturally, the Skidmore doctrine comes to mind.
In Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the Supreme Court held that considered agency views — even informal ones — should provide guidance to the courts to the extent those views have the “power to persuade.” We have applied the Skidmore rule to agencies’ views in cases “ “where statutory circumstances indicate no [congressional] intent to delegate general authority to make rules with force of law.’ ” Navarro v. Pfizer Corp., 261 F.3d 90, 99 (1st Cir.2001) (quoting United States v. Mead Corp., 533 U.S. 218, 237, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). Here we have such a case. Even though Labor lacks statutory authority to issue substantive rules regarding § 806, and even though Labor has labeled its regulations non-interpretative, under Skidmore we still cannot just throw its considered views out the window.
Nevertheless, the majority conclude that Skidmore has no place here. First, they say, the statute is unambiguous and, therefore, Labor can add nothing to its construction. Maj. Op. 80. On the heels of the majority’s lengthy statutory-interpretation analysis, this claim holds no water. A statute that is susceptible of multiple interpretations and whose meaning requires over thirty pages to explain is neither clear nor unambiguous by definition. See, e.g., 2A Singer, Sutherland Statutory Construction § 45:2 (“Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses.”). And if the statute is not, in fact, unambiguous, then Skidmore deference is in play.
In guiding judicial inquiry into the appropriate level of respect we should give Labor’s views, Skidmore requires consideration of “the thoroughness evident in [Labor’s] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.” Skidmore, 323 U.S. at 140, 65 S.Ct. 161. First, contrary to the majority’s determination that Labor provided “no reasoning,” Maj. Op. 82, Labor spent a paragraph explaining that the language of § 806, taken literally, extends protection to employees of contractors of public companies. See 69 Fed.Reg. at 52,105-06. The majority never convincingly overcome the agency’s simple application of basic grammar to the statute,[41] and so can only pretend it isn’t there.
*93 Continuing with the other Skidmore factors, the agency’s reasoning is valid because the statute’s plain language does extend coverage to employees of contractors (as I have explained above). And as for consistency, for as long as the regulations have existed they have consistently extended protection to employees of contractors of public companies. Compare 29 C.F.R. § 1980.101 (2003), with 29 C.F.R. § 1980.101 (2011), as amended by 76 Fed.Reg. 68,084 (Nov. 3, 2011). The majority cannot claim the same consistency in this court’s jurisprudence. Compare Day, 555 F.3d at 52, 54 & n. 7 (noting that § 806 aims to “prohibit[] employers from retaliating against employees” and “to encourage and protect employees who report fraudulent activity,” and holding that the Labor regulations “are entitled to Chevron deference” (internal quotation marks and brackets omitted)), with Maj. Op. 81 n. 22. Because all three Skidmore factors weigh in Labor’s favor, we owe deference to the Department of Labor’s regulations. And that means § 806 extends whistleblower protection to employees of contractors of public companies.
To sum the whole thing up, § 806 plainly protects whistleblower employees of contractors of public companies; digging deeper into the section’s context and legislative history only confirms the breadth of § 806’s protections; considered agency views further support a broad read of the statute; and the majority have had to work very hard to reject not only our own precedent but also the views of the other branches of government, to say nothing of grammar and logic. The simple answer to the certified question from the district court[42] is yes. For these reasons, I dissent.

. In addition to our own recent decision in Ozuna-Cabrera, a days-old Supreme Court decision has just reaffirmed the impropriety of imposing extra-textual limitations on statutes: where “[t]here is no indication in the text ... that the [statute] excludes [particular] workers from ... coverage,” the reasonable conclusion is "that Congress did not limit the scope of [the statute]'s coverage.” Pac. Operators Offshore, LLP v. Valladolid, - U.S. -, 132 S.Ct. 680, 689-90, 181 L.Ed.2d 675 (2012).

. The majority state correctly that their interpretation does not render superfluous the phrase “officer, employee, contractor, subcontractor, or agent of such company” — but that is not my point. Maj. Op. 68. My point, which remains unrebutted, is that their interpretation renders superfluous the word "contractor.”

. Moreover, the majority's contrary example of broader whistleblower protection elsewhere in Sarbanes-Oxley is wrong. Not only is the referenced provision (§ 1107, enacted at 18 U.S.C. § 1513) actually narrower than § 806 in some respects — for example, it covers whistleblowing only to police, not to work supervisors — but it also does nothing to protect whistleblowers. In essence, it is nothing more than a criminal obstruction-of-justice statute targeted at wrongdoers, not a whistle-blower-protection statute targeted at the wronged.

. Indeed, as the majority note, Congress "made it explicit when it intended coverage and when it did not.” Maj. Op. 73 (emphasis added).

. I repeat: the title contains no "explicit guides to the limits" on § 806. Maj. Op. 69.

. Also uncontroversial and undisputed is the majority's discussion in its “Legislative History” section of Congress's addressing "concern about Arthur Andersen” with "special provisions as to accountants.” Maj. Op. 78. In addition to being uncontroversial and undisputed, however, Sarbanes-Oxley's special provisions as to accountants are irrelevant here.

. The majority's reference to Senator Cardin's statement is a textbook example of their imputing an intent to limit where none is evident. Specifically, Senator Cardin's statement says that "[t]he whistleblower provisions of the Sarbanes-Oxley Act protect employees of the publicly traded companies,” 156 Cong. Rec. S3349 (daily ed. May 6, 2010); the majority say this statement "confirms that the covered employees are only those of publicly traded companies.” Maj. Op. 81 (emphasis added). As I point out above, the word "only” would indeed indicate limiting intent — if it appeared in Senator Cardin’s statement (or, for that matter, in absolutely any relevant legislative materials whatsoever). But it does not, so neither does any limiting intent.

. The majority’s result seems to be driven by § 806’s “very broad coverage.” Maj. Op. 69. But very broad coverage was the precise goal of § 806. See Maj. Op. 77-78 n. 17 (considering legislative history supporting broad whistleblower coverage, then rejecting that history by ipse dixit). The majority also refer obliquely to "anomalies” that would occur if we were to give § 806 the broad scope Congress intended; however, they never identify what those "anomalies” are. Maj. Op. 79-80. I, for one, can discern no "anomalies” in a determination that § 806 protects whistle-blowers against retaliation by their employers. If the majority consider anomalous the unlikely scenario where an employee of, say, office superstore Staples manages to spot and report securities fraud in the course of, say, printing and binding a public company's financial reports, I see no reason why that employee should not be a protected whistle-blower as a matter of either law or policy.

. AIR, according to the majority, is not excessively broad because it includes a subsection that narrowly defines “contractor.” But the majority's reliance on AIR's narrower provision as the example proving that § 806’s apparently broader provision is actually narrower than AIR’s is a logical Escher stairway — it’s just as nonsensical as it sounds. That AIR has a limiting definition means AIR is narrow. That § 806 has no limiting definition means § 806 is broad. Logic and grammar preclude any contrary conclusion. And the same reasoning demonstrates that the majority cannot properly rely on analogous whistleblower statutes that include limiting definitions. See Maj. Op. 75 (discussing the Energy Reorganization Act, 42 U.S.C. § 5851(a)(1), and the Pipeline Safety Improvement Act, 49 U.S.C. § 60129(a)).

. Indeed, during this appeal’s pendency, the Supreme Court has again reaffirmed the impropriety of judges’ limiting the scope of a statute's coverage for policy reasons: " '[I]f Congress’ coverage decisions are mistaken as a matter of policy, it is for Congress to change them. We should not legislate for them.’ ” Pac. Operators, 132 S.Ct. at 690 (quoting Herb's Welding, Inc. v. Gray, 470 U.S. 414, 427, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985)).

. The rule of lenity applies to immigrants in removal proceedings as well as defendants in criminal proceedings. See, e.g., I.N.S. v. St. Cyr, 533 U.S. 289, 320, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (relying on " 'the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien’ ” (quoting I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987))).

. Let me be perfectly clear: my point is that the majority are wrong to rely on cases subject to the rule of lenity. And despite disclaiming any reliance on the rule, the majority still rely on cases where the rule applies. Compare Maj. Op. 69-70 (providing that the majority "follow the same reasoning” as NCIR), with Maj. Op. 76 (providing that "the rule of lenity has no place in our interpretation of § 1514A(a)”).

. The determination is peculiar, in part, because of the basic principle that a court will generally look beyond a statute's text only when interpreting ambiguous statutes. See, e.g., Gen. Motors Corp. v. Darling’s, 444 F.3d 98, 108 (1st Cir.2006) (noting that "we ... will only look behind the plain language to the legislative history if we find the statute ambiguous” (internal quotation marks omitted)).

. Although my dissent limits its discussion to the Department of Labor's regulations, the Securities and Exchange Commission, too, has filed an amicus brief in this case urging the same broad interpretation of § 806.

. Congress has not given Labor substantive rule-making authority, but this does not matter for reasons I will discuss shortly.

. In fact, the majority implicitly acknowledge the validity of Labor's grammatical read *93 ing earlier in their opinion, when they say it merits "little discussion” that the statute "may be read differently as to the scope of the protected 'employees' as a matter of grammar.” Maj. Op. 68. If Labor's paragraph applying the basic rules of language to the statute constitutes "no reasoning," then one wonders how to characterize the majority’s "little discussion.”

. "Does the whistleblower protection afforded by § 806(a) of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, apply to an employee of a contractor or subcontractor of a public company, when that employee reports activity which he or she reasonably believes may constitute a violation of 18 U.S.C. §§ 1341, 1343, 1344, or 1348; any rule or regulation of the Securities and Exchange Commission; or any provision of Federal law and such a violation would relate to fraud against shareholders of the public company?”